IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CARLOS REED, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION (USW), and UNITED STEELWORKERS, DISTRICT 7, <br><br> Defendants. | Case No. 3:24-cv-00192-NJR |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Pending before the Court is a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure filed by Defendants United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (USW) and United Steelworkers, District 7 (collectively, "the Union"). (Doc. 33). Plaintiff Carlos Reed ("Reed") filed a response in opposition. (Doc. 35). For the reasons set forth below, the motion to dismiss is granted.

## BACKGROUND

The Court accepts as true the following facts, which are taken from the Second Amended Complaint. (Doc. 32). Reed, who is Black, worked at Solvay Fluorides, LLC's plant in Alorton, Illinois, from June 17, 1991, until his termination on March 28, 2022.

(*Id.* at ¶¶ 7-8). Reed became a master mechanic in 2014. (*Id.* at ¶ 9). He was fired for allegedly removing scrap material from Solvay and for unauthorized entrance onto Solvay's premises. (*Id.* at ¶ 21).

While employed with Solvay, Reed was a member of the collective bargaining unit there. (*Id.* at ¶ 11). The Union entered into a collective bargaining agreement with Solvay effective August 1, 2019, and was the sole representative of the members of the collective bargaining unit. (*Id.* at ¶¶ 12-13). The collective bargaining agreement set forth a four-step grievance process with the last step being a demand for arbitration that could only be carried out by the Union. (*Id.* at ¶¶ 14-15, 17-18). Any member of the collective bargaining unit is permitted to file a grievance under the collective bargaining agreement. (*Id.* at ¶ 16).

Reed filed several grievances with the Union throughout his employment at Solvay, including grievances concerning the terms and conditions of his employment and minor disciplinary action taken against him. (*Id.* at ¶ 19). The Union did not take any of these grievances to arbitration. (*Id.* at ¶ 20).

Reed filed another grievance following his termination for the alleged theft of scrap materials and improper entry onto Solvay's property. (*Id.* at ¶¶ 21-22). The grievance went through the first three steps of the process, and the Union demanded arbitration pursuant to step four of the grievance process. (*Id.* at ¶¶ 23-24). The grievance, however, ultimately did not proceed to arbitration. (*Id.* at ¶ 25). Instead, the Union settled the grievance and withdrew it. (*Id.* at ¶ 26). The settlement agreement provided that if Reed withdrew his grievance, Solvay would not prosecute Reed for his actions and would

provide Reed with a neutral employment recommendation. (*Id*. at ¶ 27). Reed was not aware of this settlement, nor did he agree to settle or withdraw his grievance. (*Id*. at ¶ 28). In fact, Reed asserts that he would not have agreed to the withdrawal of his grievance because he believed his termination was wrongful and the result of racial discrimination. (*Id*. at ¶ 29). Reed also alleges that the Union did not conduct any investigation into whether the removal of scrap by employees was condoned by management, whether similarly situated employees were treated differently, or whether his termination was the result of racial discrimination. (*Id.* at ¶¶ 30-33). He alleges that union representatives were present at several meetings where he alleged that he was being discriminated against because of his race, but they did not investigate his claims. (*Id.* at ¶¶ 34-35). Reed also alleges that the defendants themselves have a "significant history of discriminating against black employees" at the facility and have condoned discrimination against Black employees. (*Id.* at ¶¶ 36-37). According to Reed, Union officers made "racially derogatory remarks" about him, but the Union took no action. (*Id.* at ¶¶ 38-39). He also alleges that the number of Black employees at the Solvay facility has decreased significantly in recent years and virtually all Black new hires were "fired" during their probationary employment periods, but the Union took no action. (*Id.* at ¶¶ 41-43).

Reed asserts the Union has a "de facto" policy of not adequately representing Black employees on account of their race. (*Id.* at ¶ 50). As examples, he cites the Union's intervention (1) for a white employee, J.G., who was issued a notice for throwing a chair in an occupied breakroom and ultimately was not terminated, (2) for a white employee who was able to avoid discipline for his excessive tardiness and failure to show up for

work, and (3) for a white employee and a Black employee who engaged in an altercation at work. (*Id.* at ¶¶ 46-48). In the final situation, the white employee did not receive discipline, but the Black employee did. (*Id.* ¶ 48). He also alleges that the Union refused to grieve the termination of a Black employee who was fired while on statutorily protected leave. (*Id.* at ¶ 49). That employee had requested the Union file a grievance on his behalf, but the Union refused. (*Id.*). The employee endeavored to litigate the matter himself and received a monetary settlement. (*Id.*).

Reed initially sued the Union in the Circuit Court of St. Clair County, Illinois, but the Union removed the case to this Court on January 29, 2024. (Doc. 1). Reed then amended his complaint to assert a claim of discrimination in violation of 42 U.S.C. § 1981 and discrimination in violation of the Illinois Human Rights Act (IHRA). The Union moved to dismiss the complaint. (Doc. 28). Reed agreed to voluntarily dismiss his IHRA claim in Count II, but he contested the dismissal of the § 1981 count. (Doc. 30).

On April 21, 2025, the Court issued an order granting the Union's motion. (Doc. 31). The Court held that Reed had not alleged any facts that would support a conclusion that race had influenced the Union's decision to settle and withdraw his grievance. (*Id.* at p. 5). The Court also observed that a union does not have a duty to investigate employer discrimination. (*Id.* at pp. 5-6). Although the Court acknowledged that a union's "selective inaction" to the concerns of minority employees can violate § 1981, it noted that Reed had not even alleged that the Union refused to investigate his grievances but would have investigated white employee grievances. (*Id.* at p. 6). The Court therefore dismissed the amended complaint without prejudice but permitted Reed

to amend his pleading to address the deficiencies, prompting the present proceedings. Reed filed a Second Amended Complaint on May 21, 2025, pleading only a claim under § 1981. (Doc. 32). The Union again moved to dismiss the complaint (Docs. 33, 34).

## LEGAL STANDARD

A defendant's motion to dismiss may be granted in instances where the plaintiff's complaint fails to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). For a plaintiff to survive a motion to dismiss, the complaint must contain sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To be plausible, an allegation must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The factual allegations stated in the second amended complaint will be taken as true and interpreted in "the light most favorable" to the plaintiff. *Burke v. 401 N. Wabash Venture, LLC*, 714 F.3d 501, 504 (7th Cir. 2013). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are not entitled to the presumption of truth. *Ashcroft*, 556 U.S. at 678. This standard does not require "detailed factual allegations." *Bell Atl. Corp.*, 550 U.S. at 555. Rather, it simply requires that that the plaintiff gives "enough details about the subject-matter of the case to present a story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). In the discrimination context, the Seventh Circuit has said that "a plaintiff must advance plausible allegations that [he] experienced discrimination because of [his] protected characteristics." *Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 776 (7th Cir. 2022).

## DISCUSSION

The Union asserts that Reed's second amended complaint still fails to allege facts sufficient to demonstrate that it would have handled his grievance differently had he been white. It maintains Reed failed to explain how the Union administered its grievance procedure more favorably for white employees where it also filed a grievance on his behalf. The Union also argues that Reed's claim regarding its "de facto" policy of failing to adequately represent Black employees is conclusory and negated by the fact it demanded arbitration for his grievance. Reed answers that his core complaint is not that the Union failed to pursue his grievance but that the Union, on account of his race, failed to investigate the grievance sufficiently and ultimately, at the arbitration stage, settled it without consulting him. He argues that his claim is bolstered by his allegations that Union officials made racially derogatory comments and specific incidents where Black union members were treated less favorably than white members in the grievance process.

The parties by now are familiar with the legal standards governing Reed's claim. As the Court explained in its prior order, section 1981 prohibits racial discrimination in the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). To establish a race discrimination claim against a union under § 1981, a plaintiff must demonstrate that the union refused to process his grievances because of his race or his earlier complaints about race. *Webb v. AFSCME Council 31*, No. 19-4192, 2020 WL 919260, at *2 (N.D. Ill. Feb. 26, 2020) (citing *Green v. AFT/IFT Local 604*, 740 F.3d 1104, 1107 (7th Cir. 2014)); *see also Chapman v. AFSCME Council 31, Loc. 3477*, No. 17-8125, 2019 WL

214478, at *6 (N.D. Ill. Jan. 16, 2019) (noting that § 1981 "prohibit[s] unions from discriminating on the basis of race in the way they represent their members"). In other words, a racial discrimination claim under § 1981 requires a plaintiff to show that the union would have processed his grievances had he been white. *Id.* (citing *Green*, 740 F.3d at 1107).

In its prior order, the Court faulted Reed for failing to allege facts from which it could be inferred that there was a connection between his race and the Union's decision to settle and withdraw his grievance. The Union argues that Reed's second amended complaint still fails on that front. The Court agrees.

To be sure, Reed's amended pleading does add some additional details. For instance, he relays several examples of instances when the Union did and did not intervene on behalf of particular employees. These allegations most naturally pertain to a theory the Union violated § 1981 based on its "selective inaction" with regard to the grievances of minority employees. *E.E.O.C. v. Pipefitters Ass'n Loc. Union 597*, 334 F.3d 656, 661 (7th Cir. 2003). A union discriminates where it refuses to investigate a Black employee's grievance but *would* investigate a white employee's grievance. *Id.* A union also violates § 1981 if it "decided as a matter of policy not to grieve complaints of discrimination by [B]lack members of the bargaining unit because the company is hostile to such complaints and the union fears that this hostility will make it harder for the union to succeed in its dealings with the company." *Id.*

Because the Union in this case *did* file a grievance and obtain arbitration, the essence of Reed's claim is that the Union would have exercised more zeal in pursuing a

favorable outcome had he been white. (Doc. 32 at ¶ 44). Even assuming such a theory is viable, Reed's allegations do not make it plausible here.

To start, he describes two instances where the Union grieved the discipline of white employees, and those employees were not terminated. (*Id.* at ¶¶ 46-47). However, the fact the Union filed a grievance on behalf of white employees says little about whether it was inattentive to the needs of Black employees.[1] Reed also describes an incident where his employer disciplined a white employee and a Black employee after they engaged in an altercation in the workplace. (*Id.* at ¶ 48). He reports that the Union filed a grievance on behalf of both employees, and the white employee ultimately was not disciplined while the Black employe was terminated. (*Id.*). However, the fact that the Union submitted a grievance on behalf of *both* employees cuts against Reed's theory of selective inaction. To the extent Reed's claim is that the Union had a policy of failing to comprehensively investigate and advocate for its Black employees, he has not alleged anything about the strength or weakness of the Union's handling of the Black employee's grievance in that instance. Finally, Reed reports that a Black employee was fired while on statutorily protected leave and requested that the Union grieve the termination, but the Union refused. (*Id.* at ¶ 49). Of course, the Union *did* file a grievance in Reed's case (*id.* at

---

[1] A plaintiff need not allege that they were similarly situated to someone else to state a claim under § 1981. *See Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 830 (7th Cir. 2014). But if a plaintiff's only allegation connecting their alleged mistreatment to their protected characteristic is a comparison that "doesn't hold up to even the slightest scrutiny" it is not enough to survive a motion under Rule 12(b)(6). *See Miao v. United Airlines, Inc.*, 164 F.4th 622, 625 (7th Cir. 2026).

¶ 25), so it is difficult to see how its failure to do so in another instance plausibly demonstrates the existence of *a policy* of selective inaction by the Union based on race.

The only other substantive difference between Reed's current complaint and his prior pleading is his allegation that certain Union officers participated in "making racially derogatory remarks" about him. (*Id.* ¶ 38). He does not state what these remarks were, who made them, or when they occurred. Absent further context, this allegation is too vague and conclusory to plausibly connect the Union's handling of Reed's grievance in this instance to his race.[2] *Cf. Okoro v. Cook Cnty. Health & Hosp. Sys.*, No. 19-06061, 2021 WL 2413152, at *7 (N.D. Ill. June 14, 2021) ("Taken together, the FAC's allegations fail to raise Okoro's discrimination claim against Local 73 above a speculative level.").

## CONCLUSION

For these reasons, the Union's motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (Doc. 33) is **GRANTED**. The Second Amended Complaint is **DISMISSED with prejudice**. The Clerk of Court is **DIRECTED** to enter judgment accordingly and close this case.

**IT IS SO ORDERED.**

DATED: February 9, 2026

**NANCY J. ROSENSTENGEL**
**United States District Judge**

---

[2] Reed also alleges that the Union has not conducted any investigation regarding the decrease in Black employees at his former employer's facility or the firing of almost all Black probationary employees in the recent past. These allegations do not move the needle. As the Court explained previously, "a union does not have an affirmative duty 'to investigate and rectify discrimination by the employer.'" *Okoro*, 2021 WL 2413152 at *6 (quoting *EEOC v. Pipefitters Ass'n Loc. Union 597*, 334 F.3d 656, 659 (7th Cir. 2003)). Inaction is not discrimination "in any accepted sense of the term." *Pipefitters*, 334 F.3d at 660.